Submitted February 5, 2016, reversed August 23, 2017

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHELLE RENEE BENNETT,
*Defendant-Appellant.*

Multnomah County Circuit Court
14VI22054; A158764

402 P3d 732

Michelle Renee Bennett filed the brief *pro se.*

Ellen F. Rosenblum, Attorney General, Paul L. Smith, Deputy Solicitor General, and Peenesh Shah, Assistant Attorney General, filed the brief for respondent.

Before DeVore, Presiding Judge, and Lagesen, Judge, and James, Judge.

**DeVORE, P. J.**

Defendant appeals a judgment of conviction, after a bench trial, of operating a motor vehicle while using a mobile communication device, ORS 811.507 (2013).[1] She contends that the trial court should have entered a judgment of acquittal because, although she was using her cell phone while driving, she was doing so to coordinate deliveries of agricultural products from her farm and, thus, her conduct falls within the statute's exemption for using such a device "for the purpose of farming or agricultural operations." ORS 811.507(3)(b). We agree with defendant and, accordingly, reverse the judgment of conviction.

The pertinent facts are undisputed. Defendant was driving south on I-5 near the Fremont Bridge one afternoon in bumper-to-bumper traffic. Officer Byrd with the Portland Police Bureau Traffic Division drove up next to defendant and saw that she was holding a cell phone to her ear as she was talking into it. Her window was open. Byrd asked defendant to put the phone down. She yelled back, without putting the phone down, "I'm doing work. You can't give me a ticket." Byrd stopped her, and defendant explained that she was conducting business for her family pig farm, coordinating deliveries with her father, the farm owner. Byrd issued defendant a citation for violating ORS 811.507, operating a motor vehicle while using a mobile communication device.

At the hearing on the citation, defendant admitted that she had been using a cell phone while driving, but testified that she was talking to her father, the owner of their family farm, in order to coordinate deliveries of pork products to various stores and restaurants. She argued that ORS 811.507 "state[s] that we are able to be on the phone for agricultural purposes" and that "delivery of [the product produced on a farm]" is an "agricultural operation" for purposes of the statutory exemption. The trial court credited defendant's factual account—that she was "part of the agricultural business" and was discussing the delivery of a farm

---

[1] We apply the version of ORS 811.507 in effect when defendant was cited for the offense. However, the statute has since been amended to, among other things, eliminate the agricultural-purposes exemption. *See* Or Laws 2017, ch 629, § 1. Unless otherwise indicated, all references to the statute in this opinion are to the 2013 version.

product when Byrd cited her—but rejected her construction of ORS 811.507(3)(b):

> "[U]nder the facts and circumstances here, I don't find that making deliveries, whether it's for an agricultural product that was produced as part of your farming and agricultural operation, that the delivery itself is—fits within the exemption here[.]"

The court entered a judgment of conviction for violation of ORS 811.507, a Class C traffic infraction, and fined defendant $80.

On appeal, defendant contends that the court erred in entering the conviction because her conduct in using her cell phone while driving was "for the purpose of farming or agricultural operations," within the meaning of ORS 811.507(3)(b), and, therefore, the statute does not apply. "When a defendant's challenge to the legal sufficiency of the state's evidence depends upon the meaning of the statute defining the offense, we review the trial court's construction of the statute for legal error." *State v. Holsclaw*, 286 Or App 790, 792, 401 P3d 262 (2017); *see also State v. Baranovich*, 241 Or App 280, 284, 249 P3d 1284, *rev den*, 350 Or 571 (2011) (a defendant may preserve a challenge to the legal sufficiency of the evidence in a bench trial by raising the issue during closing argument).

In construing the meaning of a statute, our goal is to discern the intent of the legislature. We do that by considering the text and context, as well as any pertinent legislative history. If the statute's meaning remains uncertain, we may then apply maxims of statutory construction. *State v. Walker*, 356 Or 4, 13, 333 P3d 316 (2014); *see also State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009) (explaining statutory construction methodology).

As relevant, ORS 811.507 provides:

> "(2)   A person commits the offense of operating a motor vehicle while using a mobile communication device if the person, while operating a motor vehicle on a highway, uses a mobile communication device.[2]

---

[2] The statute defines "'[m]obile communication device'" to mean "a text messaging device or a wireless, two-way communication device designed to receive

"(3)  This section does not apply to a person who activates or deactivates a mobile communication device or a function of the device or who uses the device for voice communication if the person:

"* * * * *

"(b)  *Is using a mobile communication device for the purpose of farming or agricultural operations*[.]"

(Emphasis added.)

Defendant contends that "farming or agricultural operations" as used in ORS 811.507(3)(b) encompasses "taking goods to market"—in other words, delivery of finished farm products—focusing on the Bureau of Labor and Industries' (BOLI's) definition of "agriculture" in OAR 839-020-0004(4), as well as the dictionary definition of that term, both of which are discussed below.

The state responds that defendant's argument fails because it ignores the word "operations" in the statute and because "the phrase 'farming or agricultural operations' has a well-defined legal meaning"—one that "encompass[es] *only the agricultural production phase* of an agricultural business but not delivery of a finished agricultural product to market." (Emphasis added.) The state contends that we should apply that understanding rather than the ordinary meanings of the words used. And, the state contends, the legislative history of ORS 811.507(3)(b) supports that interpretation, or, at least, does not refute it.

As framed by the parties, there is no dispute that defendant's *purpose* for using her phone while driving was to coordinate deliveries of products from her family farm. The only question is whether that activity is properly considered "farming or agricultural operations," within the meaning of ORS 811.507(3)(b). As explained below, we conclude that it is.[3]

---

and transmit voice or text communication." ORS 811.507(1)(b). There is no dispute that defendant here was using a mobile communication device—her cell phone.

[3] In this case, it is also undisputed that defendant was an undifferentiated part of the agricultural operation for which she was coordinating deliveries. We need not—and do not—decide in this case if the exemption would apply if the driver operating the mobile communication device was an outside party or separate entity.

We begin by rejecting the state's argument that "farming or agricultural operations" has a "well-defined legal meaning" that we should apply instead of the plain meaning of those words. The state is correct that, if a term or phrase has a "well-defined legal meaning," we presume that the legislature intended for it to carry that meaning instead of its "plain, natural, and ordinary" meaning. *Dept. of Transportation v. Stallcup*, 341 Or 93, 99, 138 P3d 9 (2006); *see also Rhodes v. Gannon*, 281 Or App 1, 6, 381 P3d 869 (2016) ("If a particular term or phrase is a 'term of art' in a specific discipline, we will give the term its specialized meaning within that discipline."). Although the legislature did not define the phrase "farming or agricultural operations" for purposes of ORS 811.507(3)(b), the state contends that its legal meaning is nonetheless well-established by reference to *other*, unrelated statutes. We have reviewed those other statutes, however, and we are not persuaded that the phrase is a well-defined legal term of art, let alone that it is well-defined to mean what the state contends that it means—that is, to include only the *production* phase of a farm business. Those statutes, at most, indicate that the legislature has used the term "agricultural operations" to encompass farming activities that occur on the land, not that the legislature understood, as a matter of accepted legal terminology, that the phrase means only those activities.[4]

---

[4] Most of the statutes cited by the state regulate or are otherwise related to the *use of land*. That those statutes recognize that agricultural and farming operations occur on land does not demonstrate a well-established legal definition that the phrase "farming or agricultural operations" means *only* farming activities that occur on the land. *See* ORS 195.141(3) (factor to be considered when designating rural reserve is whether land proposed for designation is capable of sustaining, and suitable for, "long-term agricultural operations"); ORS 197.460(2) (improvements and activities related to destination resorts must "be located and designed to minimize adverse effects of the resort on uses on surrounding lands, particularly effects on intensive farming operations"); ORS 315.113(1)(c) (defining "share-rent agreement" to mean "an agreement in which the person who engages in farming operations and the person who owns the land where the farming operations are conducted share the crop grown on that land or the profits from that crop"); ORS 467.120(2)(a) (exempting "agricultural operations" from local noise ordinances; defining term to mean, as relevant, "the current employment of land and buildings on a farm for the purpose of obtaining a profit in money by * * * the feeding, breeding, management and sale of, or the produce of, livestock"); ORS 215.213(1)(r) (permitting farm stands in certain areas zoned for exclusive farm use if, among other requirements, "[t]he structures are designed and used for the sale of farm crops or livestock grown on the farm operation, or grown on the farm operation and other farm operations in the local agricultural area").

Accordingly, we turn to the "plain, natural, and ordinary meaning[s]" of the words used in the disputed phrase, "farming or agricultural operations." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993); *see also State v. Stewart*, 282 Or App 845, 851, 386 P3d 688 (2016), *rev allowed*, 361 Or 311 (2017) ("When words lack a specialized meaning, we presume that the legislature intended those words to carry their ordinary meaning."). The dictionary is a good starting point for determining the ordinary meaning of a word. *See State v. Cloutier*, 351 Or 68, 96, 261 P3d 1234 (2011) (dictionaries tell us "what words *can* mean, depending on their context and the particular manner in which they are used" (emphasis in original)); *Doe v. Medford School Dist. 549C*, 232 Or App 38, 47, 221 P3d 787 (2009) ("To ascertain the ordinary meaning of [terms not defined by statute], courts typically look to dictionary definitions.").

The relevant dictionary definition of the adjective "agricultural" means "of, relating to, or used in agriculture <~ production> <~ equipment>." *Webster's Third New Int'l Dictionary* 43 (unabridged ed 2002). In turn, "agriculture" (of which "farming" is a synonym[5]) means "the science or art of cultivating the soil, harvesting crops, and raising livestock" or "the science or art of the production of plants and animals useful to man and *in varying degrees the preparation*

---

The state also contends that three provisions of the commercial code, ORS 79.0320, ORS 80.100, and ORS 80.109, "suggest a distinction between selling agricultural products and engaging in farming operations." We agree that those statutes recognize that people other than those engaged in "farming operations" sell farm products. We do not agree, however, that the statutes support the obverse conclusion—that the sale of farm products is necessarily not part of a "farming operation."

Finally, the state also cites ORS 164.887(4)(a)(A), which defines "agricultural operations," for purposes of the crime of interference with agricultural operations, to mean "the conduct of * * * farming or ranching of livestock animals or domestic farm animals." The noun "conduct" means "the act, manner, or process of carrying out (as a task) or carrying forward (as a business, government, or war)." *Webster's Third New Int'l Dictionary* 473 (unabridged ed 2002). Therefore, ORS 164.887(4)(a)(A) defines "agricultural operations" to mean the act, manner, or process of carrying forward the business of "farming," which, as explained below, can include the marketing of farm products. Hence, ORS 164.887(4)(a)(A) tends to support *defendant's* interpretation of the phrase, not the state's.

[5] "Farming" is "the practice of agriculture." *Webster's* at 824.

*of these products for man's use and their disposal (as by marketing)." Id.* at 44 (emphasis added). Therefore, as relevant in this case, the meaning of the adjectives "agricultural" and "farming" may include the delivery of products resulting from raising crops and livestock—that is, "in varying degrees," the "preparation" and "disposal (as by marketing)" of farm products.

We turn to the noun modified by those adjectives—that is, "operations." The ordinary meaning of that word, as pertinent, means "the whole process of planning for and operating a business or other organized unit <the ~ of a large household> <the ~ of a steel mill>" or "a phase of a business or of business activity <the new forge shop has proved a valuable addition to our ~>," *id.* at 1581, which, together with the meaning of "agriculture," supports defendant's interpretation of the phrase. In short, by reference to dictionary definitions, the ordinary meaning of the phrase "farming or agricultural operations" encompasses the "whole process" or "business activity" of raising crops or livestock, which would include the delivery of those products to market.

Our inquiry does not end there, however, because we must also consider how the words are used in context. *See, e.g., Elk Creek Management Co. v. Gilbert,* 353 Or 565, 574, 303 P3d 929 (2013) ("The correct construction of ORS 90.385 does not, however, turn only on the dictionary definition of one of its words. We also must consider the context in which the legislature used the word * * *."); *Edwards v. Riverdale School District,* 220 Or App 509, 514, 188 P3d 317 (2008), *rev dismissed,* 346 Or 66 (2009) ("A dictionary definition of ordinary meaning, however, is controlling only if there is no evidence from the statute or its relevant context that the legislature intended some other meaning to apply.").

When considered, the statutory context does not indicate that the legislature intended a different meaning of the phrase. As noted above, the statutes cited by the state do not demonstrate that the phrase can be understood to mean only farm *production* endeavors. Nor do those statutes provide particularly helpful context given their lack of any

meaningful relationship to ORS 811.507.[6] *See, e.g., State v. Klein*, 352 Or 302, 309, 283 P3d 350 (2012) (a statute's context includes "related statutes"); *Denton and Denton*, 326 Or 236, 241, 951 P2d 693 (1998) (statutory context "includes other provisions of the same statute and other related statutes * * *, as well as the preexisting common law and the statutory framework within which the law was enacted").

A similar criticism is warranted as for the "context" offered by defendant—BOLI's rule defining the stand-alone term "agriculture" for purposes of the minimum wage laws.[7] We fail to see—and defendant does not explain—how an administrative rule adopted by an administrative agency to define a term in an unrelated context provides relevant context to explain the legislature's use of that word as part of a statutory phrase.

The context that *is* particularly relevant—other provisions of ORS 811.507 and its statutory framework—does not shed any additional light on the legislature's intended meaning in using the phrase "farming or agricultural operations." The legislature established the offense of operating a motor vehicle while using a mobile communication device in 2007 as a freestanding piece of legislation. Or Laws 2007, ch 870, § 2. As enacted, the offense was a secondary offense, and it applied only to those under the age of 18 who held a provisional driver license, a special student driver permit, or an instructional driver permit. ORS 811.507(1) (2007).[8] The

---

[6] At most, ORS 164.887(4)(a)(A) is very broadly related, in the sense that it, like ORS 811.507, uses the term "agricultural operations" in the establishment of a criminal offense. However, as explained previously, 287 Or App at 342 n 4, even if we considered that statute relevant context for interpreting ORS 811.507, it does not support the state's narrow reading of the statute.

[7] That rule, OAR 839-020-0004(4), provides, in part:

"'Agriculture' includes farming in all its branches and among other things includes the cultivation and tillage of the soil, dairying, the production, cultivation, growing, and harvesting of any agricultural or horticultural commodities, the raising of livestock, bees, fur-bearing animals, or poultry and any practices performed by a farmer or on a farm as an incident to or in conjunction with such farming operations, including preparation for market, delivery to storage or to market or to carriers for transportation to market."

[8] ORS 811.507 has been amended several times since its enactment. *See* Or Laws 2009, ch 834, § 1; Or Laws 2011, ch 530, § 1; Or Laws 2013, ch 757, § 1; Or Laws 2017, ch 629, §§ 1-2. Those later-enacted provisions, however, are not pertinent context. *See, e.g., Gaines*, 346 Or at 177 n 16 ("Ordinarily, only statutes

law did not apply "[t]o a person using a mobile communication device for the purpose of farming or agricultural operations." ORS 811.507(3)(b) (2007). The statute contained only one other exemption—it also did not apply "[t]o a person who is summoning medical or other emergency help if no other person in the vehicle is capable of summoning help." ORS 811.507(3)(a) (2007). Thus, the statutory context does not demonstrate that the legislature intended the exemption for "farming or agricultural operations" to connote anything other than what the plain meaning of the text indicates. To sum up, nothing about the text or context of ORS 811.507(3) suggests that the legislature understood the phrase "farming or agricultural operations" to refer only to the production phase of a farm business.

Likewise, the legislative history does not support the proposition that the legislature intended a narrower construction than the plain meaning of the phrase conveys. *Gaines*, 346 Or at 171-72 (court may consider legislative history that is useful to the court's analysis); *see also White v. Jubitz Corp.*, 347 Or 212, 223, 219 P3d 566 (2009) (observing that "legislative history cannot substitute for, or contradict the text of, [a] statute").

The bill that established the offense of operating a motor vehicle while using a mobile communication device, House Bill (HB) 2872 (2007) did not, as initially passed by the House or the Senate, include an exemption for agricultural purposes. *See* HB 2872 A-Engrossed; HB 2872 B-Engrossed. Rather, the agricultural-purposes exemption was added by a conference committee appointed to resolve differences between the House- and Senate-passed versions of the bill.

The conference committee amendments (the -B9 amendments) were offered in response to concerns about the bill raised on the House floor and in subsequent conversations among conference committee members, one of which related to the need for an exemption for agricultural operations. Audio Recording, Conference Committee on HB 2872, June 21, 2007, at :52 (comments of Rep Greg Smith

---

enacted simultaneously with or before a statute at issue are pertinent context for interpreting that statute.").

stating that, as he had explained on the House floor, when he voted for the bill in committee, he "forgot the importance of two-way communication devices as it relates to agriculture in Eastern Oregon" and so had voted no on the bill when it came before the full House and encouraged his fellow Republicans to do the same), https://olis.leg.state.or.us (accessed Aug 16, 2017); *id.* at 13:35 (statement of Rep Greg Macpherson explaining that the -B9 amendments were in response to concerns expressed in the floor debate on the bill in the House "and in subsequent conversations I had with several people who had expressed concern," including the concern about agricultural operations).

To address that concern, the proffered -B9 amendments included the exemption at issue here—for the "purpose of farming or agricultural operations." At the work session adopting those amendments, the conference committee recognized that that exemption was not limited solely to persons driving "ag equipment," nor to activities occurring only on the farm. For example, Representative Smith asked Troy Costales, Administrator of the Safety Division of the Department of Transportation, to explain how it would "apply to a teenager with a provisional license who's driving a one ton pickup during roundup, if they're driving down the road pushing cattle in a pickup." *Id.* at 11:36 (statement of Rep Greg Smith). Costales responded, "If the -B9s are adopted and using the vehicle that is considered a farm or agricultural operation, then the -B9's would say they would be able to be on a two way communication device without any problem." *Id.* at 12:12 (statement of Troy Costales). Smith asked for further clarification, and the following discussion ensued:

> "[Rep Smith:] * * * I just want to be really clear. So your interpretation is not that it's related solely to ag equipment but, as it says, equipment that's used for purposes of farming or agricultural operations. And so that could be a half-ton Chevy pickup that's being used during roundup pushing cattle.
>
> "[Costales:] * * * Yes, I agree, similar to combine and other vehicles that might be for that particular purpose.
>
> "[Rep Smith:] * * * [E]arlier in this morning Representative Macpherson and I were talking about the need for this and

I was talking about harvest. And I think a better example of the need for this would be during roundup when multiple cowboys are on horse, on ATV, and in their truck. And quite often the youngest member of the drive is in the back, in a pickup, and their job solely is to slowly push the cattle. And quite often they're all on their walkie talkies communicating and this amendment would address that issue."

*Id.* at 12:28 (comments of Rep Greg Smith and Troy Costales).

Later, Senator Prozanski commented that Representative Smith's suggestion "brought out" that "we really need to know exactly what that portion of the exception is going to be." *Id.* at 15:30 (statement of Sen Floyd Prozanski). He asked, for example, about a person who is

"let's say in at the feed store getting new supplies and as they're going up they receive a phone call on their cell phone. Are they going to be able to use that cell phone while they're driving? And I can change the scenario multiple ways, either they're coming from the farm to get another bale of whatever it may be, or it could be someone else calling as a friend who's not involved in let's say some type of ag operation."

*Id.* at 15:50. Costales responded that he was not able to answer the question, that he did not know

"what the case law is or what the enforcement definition of farming and agricultural operation is. I've not been in on any of those definitions or those conversations or have any of that with me. So I can't answer whether—you know coming from the feed store and getting a call from a friend, my thinking is that would end up being not for the purpose of the farming agricultural business. *If it's from the farm itself someone may be able to argue with law enforcement or to the judge that that's part of the business.* But I don't know which way they're going to rule with any specific examples or knowledge."

*Id.* at 16:24 (statement of Troy Costales (emphasis added)). Senator Prozanski then expressed his concern that,

"when this was described to me by Representative Macpherson, *I had the impression that we're going to have something as being a little bit more narrow.* The example that he gave me that I think that you all two had talked about was if you're moving equipment or livestock across

a road into another area, another farm, another piece of tract of land, that you need to be able to stage and communicate. Your example this morning concerns me as to doing roundup. \* \* \* *I just raise that as a concern that it doesn't seem to be quite as tight as it had been—say discussed previously.* I do want to put on the record that, as our administrator said, this is limited to highways."

*Id.* at 17:03 (statement of Sen Floyd Prozanski (emphasis added)). Nevertheless, Prozanski indicated that he supported the amendments, and the bill passed the conference committee and, ultimately, the full House and Senate with that language.[9]

That history provides two useful insights. First, the legislature clearly understood that the exemption in ORS 811.507(3)(b) was not limited to a person driving farm equipment or, as the state suggests here, to farming activities that occur on farm land. Second, the legislature understood that the language *could* be read broadly to include ancillary or nonproduction activities associated with a farm business—such as picking up supplies or transporting farm products—and deliberately chose not to narrow it. We can infer from those circumstances that the legislature most likely did not intend to limit the exemption for "farming or agricultural operations" to the production of a crop or livestock, but, rather, intended it to include, consistent with its

---

[9] The carriers of the conference committee report in the House and the Senate both noted that the amendments addressed concerns that had been raised about the need for an exemption for agricultural purposes. *See* Audio Recording, House Floor Debate, HB 2872, June 26, 2007, at 24:25 (statement of Rep Greg Macpherson that the committee amendments addressed a concern that "there may be young people who are engaged in agricultural operations who need to use some kind of two-way communications system in order to be able to communicate with a supervisor or a dispatcher in order to be able to cue up farm vehicles"), https://olis.leg.state.or.us (accessed Aug 16, 2017); Audio Recording, Senate Floor Debate, HB 2872, June 26, 2007, at 32:50 (statement of Sen Rod Monroe that committee amendments "dealt with agriculture and farming and the use of cell phones when herding cattle and so on and those kinds of things would be allowed"), https://olis.leg.state.or.us (accessed Aug 16, 2017). The examples given by the legislators were thus narrow; however, as discussed above, the "statutory text shows that, even if the legislature had a particular problem in mind, it chose to use a broader solution." *Hamilton v. Paynter*, 342 Or 48, 55, 149 P3d 131 (2006). *See South Beach Marina, Inc. v. Dept. of Rev.*, 301 Or 524, 531, 724 P2d 788 (1986) ("The legislature may and often does choose broader language that applies to a wider range of circumstances than the precise problem that triggered legislative attention." (Footnote omitted.)).

plain text, activities that are part of the farm business as a whole, including the delivery of those products to market. *See Walker*, 356 Or at 22 ("[W]here the legislative history demonstrates that the legislature was aware of the expansive nature of an enactment's text, yet chose not to narrow it, we are constrained to interpret the statute in a way that is consistent with that text[.]").

After considering the text, context, and legislative history, we conclude that the exemption in ORS 811.507(3)(b) for the "purpose of farming or agricultural operations" encompasses activities associated with the farm business as a whole, such as the delivery of products to market. So understood, ORS 811.507(3)(b) exempts defendant's conduct in this case—driving while using a cell phone to coordinate the delivery of products from her family farm to various vendors—from the statute's prohibition against operating a motor vehicle while using a mobile communication device. Consequently, the trial court erred in entering a judgment of conviction.

Reversed.